**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0101n.06

No. 10-3975

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

*Jan 27, 2012*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| CLAIRMONT MELVILLE, | ) | |
| | ) | |
| **Petitioner-Appellant,** | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Respondent-Appellee.** | ) | **O P I N I O N** |
| | ) | |

**Before: MOORE and GRIFFIN, Circuit Judges; QUIST, District Judge.**[*]

**KAREN NELSON MOORE, Circuit Judge.** In November 1992, a jury convicted Petitioner-Appellant Clairmont Melville of conspiracy to distribute and to possess with the intent to distribute over fifty grams of cocaine base. Melville has since filed two motions to vacate his sentence under 28 U.S.C. § 2255, both of which assert that the prosecution failed to correct material false testimony, thereby denying him a fair trial. The second § 2255 motion, which was supported by an affidavit purportedly from the falsely testifying witness, also includes allegations that the prosecution failed to disclose an agreement to reduce significantly the witness's thirty-year sentence in return for his testimony against Melville. After this court granted leave to file the second motion, the district court held an evidentiary hearing and denied both of Melville's claims. We **AFFIRM**.

---

[*]The Honorable Gordon J. Quist, Senior United States District Judge for the Western District of Michigan, sitting by designation.

## I.  BACKGROUND & PROCEDURE

### A.  The November 1992 Trial

In April 1992, a grand jury indicted Melville for engaging in a drug conspiracy.  Ken Lloyd Adams, the alleged leader of the operation and Melville's childhood friend from Guyana, was one of the witnesses who testified against Melville at trial.  Adams provided what the government later classified as "instrumental" testimony about Melville's involvement in the conspiracy.  Pet'r App. at 22 (§ 5K1.1 Mot. re Adams at 1).  By the time of Melville's trial, Adams and many of the other witnesses either had pleaded guilty or had been tried and convicted for their own roles in the conspiracy.  A number of those witnesses also had already received substantially reduced sentences for their cooperation in obtaining those earlier convictions.  Following Adams's testimony against Melville, the district court likewise reduced Adams's sentence from thirty to sixteen years in prison.

At trial, defense counsel asked Adams whether there had been any promises to reduce his sentence in exchange for testifying.  Adams disclaimed any such expectation.  Instead, he stated that his motivation was vindictive:  Adams had been imprisoned for his role in the conspiracy and wanted Melville to face the same result.  In closing arguments, Melville's attorney nonetheless emphasized the likely influence of a possible sentence reduction on Adams's decision to testify:

> Let's talk about these other people that make up the evidence against Mr. Melville.
> One of these individuals, Kim Taylor, she was facing 210 to 262 months, and if you
> will recall, she only ended up being sentenced to 60 months.  I would say this is a big
> difference.  Why did she end up with such a difference?  Pursuant to what we call
> 5K1.1[,] which is a provision of the sentencing guidelines, and that is essentially a
> consideration for her assisting the government, and it has got to be substantial.  She
> helped the government substantially, and the government tells the judge, asks the

judge, the judge has the discretion—he doesn't have to if he doesn't want to—to give that person a reduction in sentence.

. . . .

[A]fter someone is tried and found guilty, after their trial and their sentence, the government can still come in and ask the Court to change that person's sentence if they provide again that substantial assistant [sic]. Substantial, that has got some teeth in it, and I would submit to you that that is why Mr. Adams is here and he is facing a lot. He is facing—he is not facing—he got 30 years. Now, if he gets anywhere near the reduction that Kim Taylor did, don't you think he would say just about anything in that regard? Thirty years is a long time.

Resp't App. at 268–70 (Closing Arg. Tr. at 18–20).

Adams, however, was hardly the only witness to provide damaging testimony about the extent of Melville's role in the conspiracy. Jurors also heard from other co-conspirators, many of whom corroborated or supplemented Adams's statements. *See, e.g.*, *id.* at 24 (Trial Tr. at 72: Taylor Test.) (recounting that Melville was "top dog with Ken Adams," and that Melville "[b]rought dope, picked up money, and went in and out of different states to take care of their business"); *id.* at 90–91 (Trial Tr. at 173–74: Sutton Test.) (recalling that Melville was one of Adams's "right-hand men"); *id.* at 107–08 (Trial Tr. at 252–53: Watson Test.) (stating that Watson had worked under Melville and that Melville controlled proceeds from crack sales and gave Adams money in exchange for packages of crack). The government also produced evidence that Melville was actually present in two of the drug houses when officers executed search warrants for those premises.

Thus, after a five-day trial, the jury returned a verdict of guilty. The district court sentenced

Melville to 235 months in prison,[1] and Melville's conviction and sentence were upheld on direct

appeal. *United States v. Melville*, No. 93-3685, 1994 WL 276890 (6th Cir. June 21, 1994).

## B. Post-Conviction Proceedings

On September 23, 1998, the district court denied Melville's first motion to vacate his

sentence pursuant to 28 U.S.C. § 2255. On November 15, 2006, Melville filed a Federal Rule of

Civil Procedure 60(b) motion for reconsideration of that denial. In his second filing, Melville

presented more specific allegations and an affidavit, purportedly from Adams, that gave details about

the alleged agreement. According to the affidavit, the government promised "to ensure that

[Adams's] sentence was reduced by more than half" in exchange for his testimony. R. 84-1 (Adams

Aff. at 3). Construing Melville's filing as a motion to file a successive § 2255 motion, the district

court transferred it to this court. After we granted authorization to file the motion on the basis of

newly available evidence, we then returned the motion to the district court as a second motion to

vacate under 28 U.S.C. § 2255.

In response to Melville's motion, the government argued that the Adams affidavit was a

forgery because the signature differed from earlier documents and because the words did not appear

to be his own. The government also submitted a responsive affidavit from Assistant U.S. Attorney

---

[1]Although Melville is currently on supervised release, that does not render his § 2255 motion moot. Melville filed his motion while still incarcerated. In any event, an individual on supervised release is still "in custody" under the habeas statutes. *See Akrawi v. Booker*, 572 F.3d 252, 255 n.1 (6th Cir. 2009); *see also* 13C CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3533.4.1, at 170 (3d ed. 2008).

Gary Spartis, the prosecutor in Melville's case, asserting that Spartis had never promised anything in return for Adams's testimony. Faced with the conflicting evidence, the magistrate judge recommended an evidentiary hearing to determine whether any agreement between Adams and the government had existed. Finding the evidence immaterial to Melville's case, the magistrate judge also recommended that the district court dismiss Melville's claim of prosecutorial misconduct arising out of the government's failure to correct Adams's testimony indicating that he had not met with any government officials prior to trial.[2] The district court adopted both recommendations.

At the evidentiary hearing on June 11, 2009, Melville called only two witnesses, neither of whom had any specific recollection of his case. The government, in contrast, called two witnesses who testified at length about the local U.S. Attorney's general practices and about the government's specific actions in Melville's case. First, the government called Special Agent Frank D'Alesio, who accompanied Spartis when he interviewed Adams on November 9, 1992. D'Alesio testified that Adams was proffered during the interview—in other words, that D'Alesio and the Assistant U.S. Attorney went through the facts of the case with Adams to determine the type of testimony he could

---

[2]In support of this second claim, Melville points to the following exchange with Adams:

Q. Have you had any discussions with anyone from the government with regards to coming in here or did you just show up here one day? By here, I mean in the courtroom to testify?

A. I didn't have no discussion. I got a call from the Correction Officer and they said you have to go to court. I didn't know what I was coming for or nothing.

Q. Okay. Did you have the opportunity to review with Mr. Spartis or Detective Benson or anybody else any of your testimony before you came in here?

A. No.

Resp't App. at 217–18 (Trial Tr. at 363–64).

provide and, although Adams was not promised a reduction, it was indicated that "his cooperation would be noted to the Court." R. 113 (Evid. Hr'g Tr. at 28). D'Alesio discussed his general recollections about working with the U.S. Attorney's office in that area—specifically, that explicit promises were never made but that Assistant U.S. Attorneys would usually tell witnesses that their cooperation would be noted to the judge, who would make the final determination on the need for a reduction. In response to a question concerning whether Federal Rule of Criminal Procedure 35 or § 5K.1 motions were ever mentioned, D'Alesio stated that "I believe in this case it might have been a 5K1 we were talking about." *Id.* at 29. But when asked about the accuracy of Adams's statement that he had no expectation of a reduction, D'Alesio believed the statement to be true because no promises had been made and any indication that the government could assist in reducing Adams's sentence would have been couched in indefinite terms. Finally, D'Alesio stated generally that his testimony was based on his "general recollection of the way things were done in most cases," rather than a specific memory of Melville's case. *Id.* at 43.

The government then called Gary Spartis, the Assistant U.S. Attorney who prosecuted Melville's case. Spartis testified to his specific recollections of the November meeting with Adams. When asked whether there was any discussion about what Adams could expect in return for testifying against Melville, Spartis responded that they "didn't get into any type of discussion as to what would happen with regard to his sentence." *Id.* at 53. Spartis indicated that his reluctance to make such an offer stemmed from the fact that he "was pretty skeptical of Ken Adams as a witness. I did not know whether or not he was going to be truthful if he testified. And it really wasn't clear

until the second day or so of trial . . . whether or not we were going to risk putting Ken Adams on."

*Id.* at 54. In terms of any specific discussion about a potential Federal Rule of Criminal Procedure

35 motion, Spartis maintained that "[t]he most I would have gotten into with him would have been

that, if you are truthful, we will treat you fairly, something general like that, but nothing with regard

to Rule 35, a motion for reduction, or anything like that." *Id.* Along these lines, Spartis later stated

that

> I do not think that we represented to Ken Adams anything with regard to a reduction
> or a Rule 35. I do not think we specifically mentioned it to him, because, in my
> opinion, his testimony would be stronger if he did not expect anything. . . . [I]f he's
> not been promised anything, then it adds credibility to the witness. . . . In other
> words, it doesn't look like his testimony is bought and paid for . . . by a reduction or
> anything like that.

*Id.* at 68–69. Although Spartis recognized Adams's likely hope that his testimony would lead to a

reduction in sentence, Spartis did not believe that Adams's statements regarding his expectations for

such a reduction were inaccurate because there had been no specific discussion of that possibility.

Spartis noted, however, that because he had been aware of Adams's likely expectation, Spartis made

a point of acknowledging it in his closing argument "in order to provide full disclosure to the jury."

*Id.* at 78.

Defense counsel also questioned Spartis about the exchange in which Adams testified that

he had not been in prior contact with government officials. Because Adams was summoned to

testify and transferred to the courthouse before he had engaged in any discussions with the

government, Spartis had not deemed Adams's response to be inaccurate at the time of trial. Spartis

stated that, in hindsight, he wished he had approached the bench to discuss the proffer session, but

"[a]t the time, [Spartis] didn't interpret [defense counsel's] questions to elicit that response." *Id.* at 80.

After the evidentiary hearing, the magistrate judge concluded that Melville failed to meet his burden of showing any promise or agreement between Adams and the government that would entitle Melville to relief.[3] The district court adopted that recommendation and dismissed Melville's § 2255 motion. Melville timely appealed, and the district court granted his motions for a certificate of appealability as to the two issues now before this court.

## II. ANALYSIS

### A. Standard of Review

For the court to grant relief under 28 U.S.C. § 2255, "a petitioner must demonstrate the existence of an error of constitutional magnitude which had a substantial and injurious effect or influence on the guilty plea or the jury's verdict." *Humphress v. United States*, 398 F.3d 855, 858 (6th Cir. 2005) (internal quotation marks omitted). "[W]e review the district court's factual findings for clear error and its legal conclusions de novo." *Id.* Clear error exists "only when we are left with the definite and firm conviction that a mistake has been committed." *United States v. Kellams*, 26 F.3d 646, 648 (6th Cir. 1994). Thus, "[i]f there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* This standard is particularly difficult to overcome when a district court opts to credit one witness over another where both

---

[3]Because the Adams affidavit that Melville attached to his original motion was never authenticated, the magistrate judge did not consider it.

witnesses "told a coherent and facially plausible story that is not contradicted by extrinsic evidence,' and where [the district judge's] finding is 'not internally inconsistent.'" *Brooks v. Tennessee*, 626 F.3d 878, 897 (6th Cir. 2010) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985)), *cert. denied*, 131 S. Ct. 2876 (2011).

**B.  The Government's Alleged Failure to Disclose An Agreement with Adams**

Melville argues that the district court erred in not finding at least a tacit agreement between the government and Adams.  Melville maintains that the government's failure to disclose the agreement violated *Brady v. Maryland*, 373 U.S. 83, 87 (1963), which requires the government to disclose potentially exculpatory evidence to the defendant.  *See also Strickler v. Greene*, 527 U.S. 263, 280–81 (1999).  Melville further argues that the government's failure to correct Adams's testimony denying the agreement's existence violated *Napue v. Illinois*, 360 U.S. 264, 269 (1959), which prohibits the prosecution from using false testimony to obtain a conviction and from allowing such testimony, even if unsolicited, "to go uncorrected when it appears."

The law is clearly established that both express agreements and "less formal, unwritten or tacit agreement[s]" between the prosecution and a witness constitute impeachment material that must be turned over to the defense.  *Bell v. Bell*, 512 F.3d 223, 233 (6th Cir. 2008) (en banc).  But the mere fact that a witness has an expectation of favorable treatment in exchange for his testimony is insufficient to demonstrate such an agreement; rather, "there must be some assurance or promise from the prosecution that gives rise to a *mutual* understanding or tacit *agreement*." *Akrawi*, 572 F.3d at 263.  Thus, as long as the government does not promise anything to a witness before he or she

takes the stand, the government may reward that witness for giving favorable testimony even if the government has not previously disclosed to the defendant its intent to do so. *Id.*; *Bell*, 512 F.3d at 234.

Even if we assume that Melville has provided sufficient evidence to support a tacit agreement between Adams and the government, that alone does not warrant reversal. Melville still must demonstrate all elements of a *Brady* violation, which include (1) that the evidence was favorable to him; (2) that the government withheld the evidence; and (3) that he was prejudiced by the non-disclosure—in other words, that "'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Strickler*, 527 U.S. at 281–82, 290 (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)).

Melville argues that because Adams's testimony was "instrumental," "there is a reasonable probability that [the jury] would have acquitted [him]." Pet'r Br. at 15. *Akrawi* is again instructive. In *Akrawi*, the court determined that in spite of the undisclosed tacit agreement, the petitioner was unable to show prejudice to support a *Brady* violation. 572 F.3d at 264–65. There, some evidence had been presented at trial to support "the potential for a charge-reduction deal," which already permitted defense counsel to use it to impugn the witness's credibility to some degree. *Id.* at 264. Although disclosure of the agreement arguably would have allowed for more effective cross-examination, the court determined that it would have been only "incrementally so." *Id.* Moreover, the prosecution's case did not hinge on that single witness's testimony; other witnesses also gave "damning" evidence to support the conviction. *Id.* Thus, despite only a small amount of physical

evidence and a case based largely on testimony by cooperating accomplices, we determined in

*Akrawi* that the prosecution's failure to disclose the agreement did not result in prejudice. *Id.* at 265.

The analysis in Melville's case is largely the same. Although specific evidence of an

agreement was not presented at trial, both sides in closing arguments addressed the possibility that

Adams sought to receive the same type of sentence reduction as other co-conspirators. *See* Resp't

App. at 268–70 (Trial Tr. at 18–20) (excerpt from the defense's closing argument in which counsel

discussed the government's ability to move for a reduction in sentence and surmised that "that is why

Mr. Adams is here"); *id.* at 279 (Trial Tr. at 29) (excerpt from the government's closing argument

that disclosed sentence reductions granted for other co-conspirators but reiterated that Adams

received no promise of a similar reduction). Thus, as in *Akrawi*, while cross-examination may have

been a more effective mode of impeachment, its absence did not jeopardize the fairness of Melville's

trial. Likewise, although Adams provided valuable testimony against Melville, he was by no means

the only witness to do so. It therefore cannot be said that further undermining Adams's credibility

would have resulted in a different outcome any more than in *Akrawi*.[4]

---

[4]As discussed in greater detail below, an uncorrected statement must be "indisputably false" to give rise to a violation under *Napue v. Illinois*, 360 U.S. 264 (1959). *Akrawi*, 572 F.3d at 265 (internal quotation marks omitted). Because the evidence does not unquestionably demonstrate an agreement between Adams and the government, Melville's contention that the prosecution violated *Napue* by failing to disclose an agreement also fails.

11

**C.   The Assistant U.S. Attorney's Failure to Disclose Adams's Allegedly False Testimony Regarding Adams's Prior Meeting with Government Officials**

Melville next argues that the prosecutor's failure to correct Adams's testimony denied Melville a fair trial because it violated *Napue v. Illinois*, 360 U.S. 264 (1959).[5] "The knowing use of false or perjured testimony constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998) (internal quotation marks omitted). To succeed on such a claim, a defendant "must show (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false." *Id.* (internal quotation marks omitted). To show falsity, the defendant must demonstrate that the testimony was "actually perjured"; "mere inconsistencies" are not sufficient to establish knowing use of false testimony. *Id.* (internal quotation marks omitted); *see also Akrawi*, 572 F.3d at 265 ("The subject statement must be 'indisputably false' rather than 'merely misleading.'" (quoting *Abdus–Samad v. Bell*, 420 F.3d 614, 626 (6th Cir. 2005))). In turn, "[a] false statement is material . . . and '[a] new trial is required[,] if the false testimony could in any reasonable likelihood have affected the judgment of the jury." *Brooks*, 626 F.3d at 895 (second and third alterations in original) (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)).

---

[5]The government urges us to apply the law-of-the-case doctrine to decide this issue. Because this case is easily resolved on the merits, we decline to do so. In any event, circuit precedent renders it unlikely that law of the case applies. Although we have not definitively decided the question, the Sixth Circuit has strongly suggested that law of the case does not apply to successive habeas petitions because of the likelihood "that each habeas petition is a separate and distinct case." *Rosales-Garcia v. Holland*, 322 F.3d 386, 398 n.11 (6th Cir.) (en banc), *cert. denied*, 539 U.S. 941 (2003).

Even if we take at face value Melville's assertion that Adams's statements regarding his interactions with the government were "indisputably false," Melville still falls short on the remaining prongs. First, Melville's materiality argument suffers for the same reasons as did the prejudice argument tied to his first claim. Melville's main use for uncovering the alleged falsehood was, again, to impugn Adams's credibility by showing that Adams had lied on the stand. But both Adams's status as a convicted co-conspirator and his likely self-preserving motive for testifying had already damaged Adams's credibility to some degree. Moreover, Adams's statements were corroborated by other witnesses. Thus, even if unveiling the falsehood would have irreparably damaged Adams's credibility, there is no reason to believe that the jury's decision-making processes would have been materially altered. Second, the evidence presented about the prosecution's knowledge indicates that at the time of trial, Spartis believed that the exchange presented "correct, or accurate, testimony on Mr. Adams' part, because he never did have any discussions with us prior to him being writted back and meeting with us on the first day of trial." R. 113 (Evid. Hr'g Tr. at 56). Although Spartis later had second thoughts about his initial interpretation, Spartis's testimony at the evidentiary hearing consistently maintained that he did not harbor such concerns during the trial. Melville thus has not shown that the government knowingly used false testimony in violation of his rights. *See Coe*, 161 F.3d at 343.

### III. CONCLUSION

For the reasons explained above, we **AFFIRM** the district court's dismissal of Melville's motion to vacate his sentence pursuant to 28 U.S.C. § 2255.